\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ACQUISITION AGREEMENT

BY AND AMONG

SOUTHERN AIRWAYS CORPORATION

AND THE SHAREHOLDERS OF

MULTI-AERO, INCORPORATED AND

N107KA, INC., N208EE, INC., AND N803F, INC.

WITH RESPECT TO

THE PURCHASE AND SALE OF ALL OF THE STOCK OF MULTI-AERO,
INCORPORATED

AND CERTAIN RELATED MATTERS

AS OF MARCH 31, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



PETITIONER'S EXHIBIT
ALL-STATE LEGAL®
1

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement"), made and entered into as of March 31, 2022, by and among SOUTHERN AIRWAYS CORPORATION, a Delaware corporation having its principal place of business at 2875 South Ocean Blvd., Suite 256, Palm Beach, Florida 33480 ("Purchaser") and the parties named in Section 4.1 hereof (the "Shareholders"),

### WITNESSETH THAT:

WHEREAS, the Shareholders own all of the issued and outstanding capital stock of MULTI-AERO, INCORPORATED d/b/a AIRCHOICE ONE, a Missouri corporation having its principal place of business at 12300 Old Tesson Ferry Road, St. Louis, Missouri 63128 and Fenton, Missouri ("Multi-Aero") and, N107KA, INC., N208EE, INC., and N803F, INC. (collectively, the "Aircraft Entities"), all Delaware corporations each with a registered address of 850 New Burton Road, Suite 201, Dover, Delaware 19904 (Multi-Aero, the Aircraft Entities and each of their Subsidiaries (as such term is defined herein) shall be referred to collectively herein as the "Companies").

WHEREAS, the Purchaser desires to purchase, and the Shareholders desire to sell, all of Multi-Aero's issued and outstanding capital stock, subject to the terms and conditions set forth herein,

NOW THEREFORE, in consideration of the mutual covenants set forth herein, the Purchaser and the Shareholders hereby represent, warrant, covenant, and agree as follows:

1.0   DEFINITIONS. For purposes of this Agreement, the following terms shall have the following meanings:

1.1   "Aircraft" shall mean all aircraft and operable aircraft engines owned by Multi-Aero or any of the Aircraft Entities, including (i) for each such aircraft and aircraft engine, the manufacturer, model, and manufacturer's serial number (ii) for each such aircraft, the manufacturing year, (iii) the aircraft registration number, the Certificate for each such Aircraft, and current physical location of each such aircraft and aircraft engine, and (iv) whether each such aircraft or aircraft engine is operating, stored or in maintenance.

1.2   Aircraft Entities" shall have the meaning set forth in the first "WHEREAS" clause of this Agreement.

1.3   "Certificates" shall mean (i) the Air Carrier Certificate No. MUIA594G issued by the U.S. Department of Transportation to Multi-Aero December 9, 1986 and reissued May 17, 2010; (ii) Certificate No. MUIA594G (Commuter and on-demand operations (for d/b/a Air Choice One, Air Choice, and Air Choice Cargo) and Part 91 operations for crew, maintenance, ferry, repositioning, and company officials; and (iii) Air Agency Certificate MUIR594G (repair station operations).

1.4 "Closing" shall mean the closing described in Section 6.1 hereof. "Closing Date" shall mean the date on which the Closing is held.

1.5 "Common Stock" shall mean the common stock of each Company, no par value per share.

1.6 "Companies" shall have the meaning set forth in the first "WHEREAS" clause of this Agreement; each of the Companies shall be referred to individually as a "Company".

1.7 "June Balance Sheet" shall have the meaning set forth in Section 2.27.8 hereof.

1.8 "FF&E" shall mean the furniture, fixtures and equipment, computer systems (including hardware and servers), printers, small wares, vehicles, laptops, cell phones, leasehold interests on rented properties owned by the Companies on which the Company pays personal property tax, and all other tangible assets used by any of the Companies in connection with the business of Multi-Aero.

1.9 "Financial Statements" shall have the meaning set forth in Section 2.27.1 hereof.

1.10 "Governmental Authorizations" shall have the meaning set forth in Section 2.24(a).

1.11 "Initial Closing Date" and "Rescheduled Date" shall have the meanings set forth in Section 6.1 hereof.

1.12 "Knowledge of the Company" means any matters known by, or that should be known following reasonable diligence and inquiry by any of the Shareholders.

1.13 "Legal Requirement" means any federal, state, local, municipal, or other law (including common law), statue, code, ordinance, regulation, rule, regulatory or administrative ruling or guidance, directive, order, requirement or rule of law of any federal, state, local, municipal, or other court, legislature, executive or regulatory (including self-regulatory and non-governmental regulatory) authority, agency or commission, or other governmental or quasi-governmental entity, authority, organization or instrumentality, or any department, agency, subdivision, board, directorate, tribunal or other instrumentality of any of the foregoing.

1.14 "Proceeding" means any complaint, lawsuit, action, suit, civil penalty action, compliance action, enforcement action, or other proceeding at law or in equity or order or ruling, in each case by or before any Governmental Authority, administrative adjudicator or arbitral tribunal, or any matter for which a Governmental Authority has opened a formal investigation

1.15 "Purchaser's Counsel" shall mean Morrison-Tenenbaum, 87 Walker Street, Second Floor, New York. NY 10013.

1.16 "Seller's Counsel" shall mean Steven H. Akre, PC, 13321 North Outer Forty Road, Suite 100, St. Louis, MO 63017.

1.17 "Shareholders' Agreement" and "Representatives" shall have the meanings set forth in Section 2.28.3 hereof.

[ 2 ]

2.0 REPRESENTATIONS AND WARRANTIES OF THE SHARE-HOLDERS. The Shareholders jointly and severally represent and warrant to the Purchaser as follows:

2.1 ORGANIZATION. Multi-Aero, Incorporated is a corporation, duly organized, validly existing, and in good standing under the lawsof the State of Missouri, and has all requisite corporate power, franchises and licenses to own its property and conduct the business in which it is engaged. Schedule 2.1 annexed hereto and made a part hereof is a complete list of each of the business names used by the Company during the five (5) year period ending on the date of this Agreement. The Aircraft Entities are corporations duly organized, validly existing, and in good standing under the laws of the State of Delaware, and have all requisite corporate power, franchises, and licenses to own their property and conduct the business in which they are engaged.

2.2 CAPITALIZATION. Each Company is only authorized to issue one class of stock; no class of the Company's capital stock is authorized, issued or outstanding other than the Common Stock. Multi-Aero is authorized to issue 30,000 shares of Common Stock. There are 27,000 shares of Common Stock, no par value, issued and outstanding. The name of each Shareholder and the number of shares of Common Stock owned by each Shareholder are set forth in <u>Section 4.1</u> hereof. All of the issued shares of Common Stock have been fully paid and validly issued, are nonassessable and have been issued without violating the preemptive rights of any person or entity and without violating any law, rule or regulation, and are not subject to any right of first refusal or similar right. None of the Companies has any outstanding any options or warrants to purchase, or contracts to issue, or contracts or any other rights of any nature entitling anyone to acquire, shares of the capital stock of any class or kind of any Company, or securities convertible thereinto. No Company has issued or outstanding securities or instruments entitling the holders thereof to acquire any capital stock of any Company. None of the Companies has granted registration rights to any Shareholder or any other person or entity.

2.3 SUBSIDIARIES. <u>Schedule 2.3</u> annexed hereto sets forth in full the name, state of incorporation, number of shares owned by each Company and number of shares issued and outstanding of each of the corporations (the "<u>Subsidiaries</u>") in which each Company owns any securities or has the right to own any securities. Each of the Subsidiaries is a corporation duly organized,validly existing and in good standing under the law of its state of incorporation, and has all requisite power, franchises and licenses to own its property and conduct the business in which it is engaged. All of such shares indicated on <u>Schedule 2.3</u> as issued shares have been fully paid and validly issued, are non-assessable and have been issued without violating the preemptive rights of any person or entity and without violating any law, rule or regulation, and are not subject to any right of first refusal or similar right. None of the Subsidiaries has outstanding any options or warrants to purchase, or contracts to issue, or contracts or any other rights of any nature entitling anyone to acquire, shares of its capital stock of any class or kind, orsecurities convertible thereinto. The Subsidiaries have no issued or outstanding securities or instruments entitling theholders thereof to acquire any capital stock of any Subsidiary. Except for the Aircraft Entities (each of which is a wholly owned Subsidiary of Multi-Aero), the Company has no Subsidiaries, and none of the Aircraft Entities has any Subsidiaries.

2.4 QUALIFICATION. <u>Schedule 2.4</u> annexed hereto contains a list of all states in which each Company does business. Each Company is qualified to do business in each state as an air carrier in interstate commerce.

2.5   OTHER INTERESTS. Except as set forth in Schedule 2.5 annexed hereto, no Shareholder, director or officer of the Company has, either directly or indirectly, (a) an interest in any corporation, partnership, proprietorship, association, or other person or entity which produces or sells services which are similar to those which are produced, sold, or rendered by each Company, or (b) an interest in any contract or agreement to which the Company or any of the Subsidiaries is a party or by which it may be bound; provided, however, that the representations contained in this first sentence of Section 2.5 shall not apply to any interest of less than 1% in the securities of any corporation whose common stock is publicly held. No Company has any equity interest, direct or indirect, in any entity other than the Subsidiaries. None of the Companies participates in any joint ventures other than joint ventures described in contracts listed in Schedule 2.15 annexed hereto.

2.6   REAL PROPERTY. Schedule 2.6 annexed hereto is a complete list of all real property owned by each Company.

2.7   REAL, PERSONAL AND INTANGIBLE PROPERTY LEASES. Schedule 2.7 annexed hereto contains a complete list of all real property leases to which the Company or any of the Subsidiaries is a party, the name and address of the landlord and the date and expiration date of each such lease. A true copy of each such lease has been delivered to the Purchaser and a copy thereof has been delivered to Purchaser's Counsel at the addresses set forth in Section 11.0 hereof. The Companies are not in default under any such lease or is aware of any facts which, with or without notice and/or the passage of time, would constitute such a default. Each leased premise complies in all material respects with all municipal, state and federal statutes, ordinances, rules and regulations applicable to the use of the property, the construction of the building, and the present use made of the premises by each Company. The roof, exterior walls and all other structural components of each such building are in a good condition; no Company is required under applicable lease provisions to make any repairs thereto; and the Companies have done all periodic maintenance which they are required to do under applicable lease provisions and have not deferred any such maintenance. The leasehold interests under which any Company is a lessee are subject to no liens, claims or encumbrances, and they enjoy a right of quiet possession as against any lien or other encumbrance on the property. Except as indicated on Schedule 2.7, no consent to the transactions contemplated by this Agreement is required of any landlord under any such lease.

2.8   AIRCRAFT, EQUIPMENT, FF&E.

2.8.1   Schedule 2.8.1, annexed hereto contains an accurate and complete list of all Aircraft, equipment and FF&E owned or leased by each Company, including the name and address of the lessor, the expiration date of the lease and the monthly rent and any additional rent payable under each such lease. A true copy of each such lease has been furnished to the Purchaser and a copy thereof has been delivered to the Purchaser's Counsel at the addresses set forth in Section 11.0 hereof.  The Company is not in default under any of such leases and is not aware of any fact which, with notice and/or passage of time, would constitute such a default.

2.8.2  Each Company has made available records relating to the maintenance schedule of all Aircraft and the status of maintenance with respect to all Aircraft as of such date. Each Company is operating and maintaining the Aircraft and engines in the ordinary course of business consistent with past practices and in material compliance with the obligations related thereto, including all Legal Requirements, instructions for continued airworthiness, airworthiness directives, and any leases, airframe, and engine maintenance programs applicable to such Aircraft. The maintenance records accurately reflect the conditions of the Aircraft in all material respects. Schedule 2.8 sets forth a true and complete list of all in-service Aircraft conveyed hereunder or to be leased or subleased by Purchaser, either directly or through an Aircraft Entity or any third party, including the manufacturer model, FAA registration number and vintage thereof, including the name of the lessee or sublessee thereof, and the engines appurtenant to such aircraft. Except as set forth on Schedule 2.8, there are no Material Contracts (other than, with respect to an obligation to lease or sublease, existing leases or subleases covering the Aircraft and the engines) pursuant to which the Company is obligated to purchase, finance or lease aircraft, engines or simulators. There is no pending default under, or breach of, any lease of Aircraft or engines to which any Company is a party. All Aircraft conveyed or to be leased or subleased by Purchaser, either directly or through an Aircraft Entity, are registered on the FAA aircraft registry and are in such condition as may be necessary to enable the airworthiness certification of the aircraft with the FAA to be maintained in good standing at all times other than during temporary periods of storage, maintenance, testing or modification, or during periods of grounding by applicable governmental authorities.

2.9     CONDITION OF ASSETS. All property, equipment and FF&E owned and/or leased by the Companies or used by any Company in connection with its business is in good condition, normal wear and tear excepted, and is in good operating order, except as set forth in Schedule 2.9 annexed hereto. All of the inventory of the Company, other than inventory determined to be obsolete in preparing the balance sheet referred to in Section 4.5 hereof, is currently usable and salable in the ordinary course of business.

2.10   ACCOUNTS AND NOTES RECEIVABLE.  All accounts and notes receivable of the Companies have originated in the ordinary course of business, represent valid obligations due to the Companies and are currently collectible in the aggregate recorded amounts thereof. The allowance for doubtful accounts shown on the books of the Companies is adequate. To the extent that the accounts and notes receivable of the Companies outstanding as of the Closing Date, net of the allowance for doubtful accounts recorded on the Company's books (in an amount consistent with prior practice) as of the Closing Date, shall be paid to Seller upon receipt of such payments.  A true and complete schedule of the accounts of each Company which were more than 90 days old as of February 1, 2022 has been furnished to the Purchaser. Except as set forth in Schedule 2.10 annexed hereto, no accounts receivable of the Companies have been assigned or factored, and none of the Companies has security agreements with any account debtors. None of the Companies has received notice that any customer disputes the amount of any receivable reflected on the books of each Company. Except as noted in Schedule 2.10, no factual basis exists for customers to obtain a credit with respect to air transport ticketing sold by Multi-Aero other than prepaid unused, expired, or "no-show" tickets.  In the event Multi-Aero is required to

grant any such credit or expend any funds to reimburse customers of Multi-Aero with respect to any such claim in relation to any account receivable due prior to the Closing Date, the first amounts payable pursuant to Section 4.3.2 shall be reduced by the aggregate net amount of such prepaid, unused tickets. To the extent that a customer of Multi-Aero has agreed in writing to a limit on the period in which that customer may receive a credit or refund as a result of such claim, then any credits granted, or refunds made, to that customer after the expiration of the specified time period shall not result in a reduction in the amount payable pursuant to the Section 4.3.2.

2.11 ACCOUNTS PAYABLE.  Except as set forth in Section 2.11, no Company has any accounts payable which have been due and payable for more than 90 days.

2.12 INTANGIBLE PERSONAL PROPERTY. Schedule 2.12 annexed hereto contains an accurate and complete list of all intangible personal property owned or used by each Company, including Certificates issued by the Department of Transportation and/or Federal Aviation Administration, as well as all trademarks, copyrights, and trade names. A true copy of all written instruments which evidence such intangible personal property has been delivered to the Purchaser and a copy thereof has been delivered to the Purchaser's Counsel at the addresses set forth in Section 11.0 hereof. Except as indicated in Schedule 2.12, the Company is the sole and exclusive owner of each of said items of intangible personal property; there are no claims, demands, or findings pending against any such owner with respect to any of such items of intangible personal property, and no Proceedings have been instituted, are pending, or, to the Knowledge of the Company, have been threatened to terminate or cancel any such agreements or which challenge the right of the any Company with respect to any of such assets: and there are no facts known to the Shareholders which make it likely that any such agreements will not be renewed at their next expiration date or which might reasonably serve as the basis, in whole or in part, of any claim that any part of the business carried on by the Companies infringes the patent, trademark, trade name, copyright, or other rights of any other person. Schedule 2.12 also indicates the name and address of any person who owns any patent, patent application, trademark, trademark application, trade name, or copyright used by any of the Companies and specifies the date of the agreement authorizing such use. Each Company has the unrestricted right to use, free from any rights or claims of others, all trade secrets and customer lists which they have used or which they are now using in connection with the sale of any and all products or services which have been or are being sold by them. Except as set forth in Schedule 2.12, each Company has the unlimited right to use all items of intangible property required by such entities to conduct their businesses.

2.13 GOOD TITLE. The Companies have good and marketable title in and to all property, tangible and intangible, used in their businesses, including without limitation the Aircraft, equipment and FF&E. Such property is free and clear of any security interests, consignments, liens, judgments, encumbrances, restrictions, or claims of any kind except as otherwise disclosed on Schedule 2.13 annexed hereto.

2.14 BANKS. Schedule 2.14 annexed hereto contains a complete list of all the names and addresses of each bank in which, at Closing, each Company maintain an

account, each bank account number owned by such entities and the names of persons authorized to draw on each account.

## 2.15  MATERIAL CONTRACTS.

2.15.1    Schedule 2.15 annexed hereto lists or describes all outstanding contracts (written or oral) to which each Company is a party including (a) the top customers of the Company and its Subsidiaries (collectively, the "Material Customers") constituting at least fifty percent (50%) of the revenue of Multi-Aero based on the its revenue for the years ended December 31, 2019 and December 31, 2021, and the amount of revenue attributable to each Material Customer during such periods, (b) an accurate and complete list of the top suppliers of the Multi-Aero (collectively, the "Material Suppliers") constituting at least fifty percent (50%) of the Dollar value of purchases by Multi-Aero based on the aggregate dollar value of purchases for the years ended December 31, 2019 and December 31, 2021, and the dollar value of purchases attributable to each Material Supplier during such periods, (c) an accurate and complete list of all unredeemed tickets purchased for the year ending December 31, 2021 ("Unredeemed Tickets"), and (d) contracts which involve the sale or purchase of products or services, or any assets of the Companies in the ordinary course of business having an aggregate dollar value (with respect to each such contract) of more than $20,000 to be paid or received by any Company (together with Material Customer contracts and Material Supplier contracts, "Material Contracts").

2.15.2  Except as set forth on Schedule 2.15, no Material Customer or Material Supplier (i) has provided the Shareholders or any of the Companies with notice (written or oral) terminating, suspending or reducing in any material respect, or specifying an intention to terminate, suspend or reduce in any material respect in the future, or otherwise reflecting a materially adverse change (including pricing) in, the business relationship between such Material Customer or Material Supplier and the Company, or (ii) has cancelled or otherwise terminated or materially amended, modified or reduced any such contract.

2.15.3  No Company purchase commitment of is in excess of the normal, ordinary, and usual requirements of their business or was made at any price in excess of the then-current market price or contains terms and conditions more onerous than those which are consistent with the Company's past practices. None of the Companies purchases supplies, materials or services from entities in which either (a) any Company is directly or indirectly a shareholder, but of less than 100% of the outstanding capital stock, or (b) any Shareholder or family member of a Shareholder has a beneficial interest, except as noted in Schedule 2.15. Such transactions are on terms no less favorable to the Companies than those that would be available from independent third-party suppliers.

2.15.4  None of the Companies has outstanding bids, or bid proposals, or quoting prices inconsistent with past profit margins or permitted by the Department of Transportation or Federal Aviation Administration.  Schedule 2.15 lists all pending proposals.

2.15.5 None of the Companies is a party to or otherwise bound by any contract, agreement, plan, lease, license, commitment, or undertaking which is materially adverse to any aspect of the business of the Companies.

2.15.6 All of the contracts recited or referred to in Schedule 2.15 are valid and binding obligations of the parties thereto, enforceable in accordance with their respective terms and in full force and effect.

2.15.7 Except to the extent described in Schedule 2.15, none of the Companies are in default under any Material Contract to which any such entity is a party, and there are no disputes or renegotiations ongoing with respect thereto.

2.15.8 Copies of the contracts listed or referred to on Schedule 2.15 have been delivered to the Purchaser.

2.15.9 The transactions contemplated hereby do not require the approval of any party to any contract listed on Schedule 2.15 except for approvals obtained prior to the date hereof.

2.16   TAXES.

2.16.1   The Companies have filed returns for and paid in full all federal, state and local income, sales, use, excise, franchise, employment, payroll, property and other taxes, fees, charges, assessments, penalties and interest ("Tax Liabilities") to the extent such filings and payments are required prior to the date hereof. Said returns are true and correct and properly included all income and deductions of each Company allocable to the periods for which the returns were filed; no deficiencies, assessments, or additional Tax Liabilities have been proposed or threatened against the Company, its assets, the Subsidiaries or their assets. Multi-Aero has reserved adequately (a) on its consolidated financial statements (including the financial statements annexed hereto as Schedule 2.27) with respect to taxes accrued but not payable prior to the date of said statements and (b) on its books and records with respect to taxes accrued since the date of the last such financial statement but not payable prior to the date of this Agreement. None of the Companies has executed any waiver of the statute of limitations on the assessment or collection of any Tax Liabilities.

2.16.2 The current year federal income tax returns and state income tax returns of the Companies have not been audited or examined by the Internal Revenue Service or the State of Missouri or any other state. The Parties will allocate all tax attributes, including income and deductions through March 31, 2022 resulting in short year allocations period for Purchaser of April 1, 2022 to June 30, 2022 and for Seller a short year allocations period of July 1, 2021 to March 31, 2022.

2.16.3 To the Knowledge of Multi-Aero, there are no pending investigations of the tax returns of any Company by any federal, state, or local taxing authority, except as set forth in Schedule 2.16 annexed hereto.

2.16.4 None of the Companies has filed any consent pursuant to Section 341(f) of the Internal Revenue Code of 1986, as amended (the "Code"), relating to collapsible corporations.

2.16.5 Each Company has, at all times, valued their inventory at cost. No Company has agreed nor is required to make any adjustment under Section 481(a) of the Code by reason of a change in accounting method or otherwise. No Company has made federal or state tax elections evidenced by a filing (other than a tax return) with the appropriate authorities.

2.16.6 Except as set forth in Schedule 2.16, none of the Companies has any assets subject to recapture under Sections 1245 and 1250 of the Code.

2.16.7 None of the Companies hold installment obligations with respect to which the recognition of income has been deferred. Except as set forth in Schedule 2.16, no Company holds reserve for bad debts, deferred income accounts or previously expensed items which would constitute income under the tax benefit rule in the event of the sale of all of the Companies' assets or the sale of the Subsidiaries' assets.

2.17 PROCEEDINGS. Except as disclosed on Schedule 2.17 annexed hereto, to the Knowledge of the Company, there are no Proceedings pending or threatened against any of the Companies, nor are the Companies subject to any existing judgment which might affect their financial condition, business, profitability or property, nor have they received any inquiry from an agency of the federal or of any state or local government about the transactions contemplated hereby, or about any violation or possible violation of any law or regulation affecting their businesses or assets.

2.18 LABOR, BENEFIT AND EMPLOYMENT. Except as disclosed on Schedule 2.18 annexed hereto, there are no contracts with any employees of any Company nor any personnel manual, employment contracts, deferred compensation, pension, profit sharing, bonus, savings, retainer, consultant, retirement, welfare, vacation, sick leave, personal leave, severance or other plans or programs for the benefit of the employees of each Company. None of the Companies is in default with respect to any such manual, contract, plan or program. Copies of all written versions of such manuals, contracts, plans or programs have been delivered to the Purchaser and a copy thereof has been delivered to Purchaser's Counsel at the addresses described in Section 11.0 hereof.

2.19 CURRENT EMPLOYEES AND EMPLOYMENT CONDITIONS. Annexed hereto as Schedule 2.19 is a list, as of the date of this Agreement, showing the names of all employees and contractors of each Company being paid at a current annual rate (whether by salary, commission or otherwise) in excess of $25,000, together with their job titles, weekly rate of pay and incentive compensation arrangements, if any. Except as set forth on Schedule 2.19, no Company is indebted to nor a creditor of any of the Shareholders or of any relative of any of the Shareholders except for accrued wages and salaries.

2.20 ERISA. None of the Companies has any unfunded past service liability under any employment benefit plans and all accrued liabilities thereunder have been paid or

will be paid prior to the Closing Date. Each Company has fully complied with all provisions of the Employees Retirement Income Security Act ("ERISA") with respect to their employment benefit plans. The Company and its Subsidiaries do not contribute to a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA.

2.21  EMPLOYMENT PRACTICES.  To the Knowledge of the Company, each Company is in compliance in all material respects with all federal and state laws regarding employment, wages, and hours. No Company is engaging in or has engaged in any discriminatory hiring or employment practices or any unfair labor practices. To the Knowledge of the Company, no employment discrimination or unfair labor practice complaints against any Company are pending or are threatened to be filed with any federal or state agency having jurisdiction over labor matters affecting such Company.

2.22  INSURANCE. Each Company has in full force and effect insurance policies of the types and in the amounts set forth and described in Schedule 2.22 annexed hereto, and copies of said policies will be delivered to the Purchaser immediately after the execution hereof.

2.23  COMPLIANCE WITH LEGAL REQUIREMENTS.

2.23.1  To the Knowledge of the Company, each Company has complied in all material respects with all Legal Requirements and none of the Companies has received notice or advice to the contrary.

2.23.2  To the Knowledge of the Company, each Company is and at all times has been in compliance in all material respects with (i) all Legal Requirements regarding personally identifiable information ("Privacy Laws"), and (ii) internal and external privacy policies relating to (A) the privacy of each Company's customers, and (B) the access, use, collection, storage, maintenance, disclosure, transfer and any other processing of any personally identifiable information accessed, used, collected, stored, maintained, disclosed, transferred or otherwise processed by or for any Company. Attached to Schedule 2.23.2 are accurate and complete copies of all internal and external privacy policies of Multi-Aero. Multi-Aero has at all times taken all steps reasonably necessary (including implementing and monitoring compliance with adequate measures with respect to technical and physical security) to ensure that personally identifiable information is protected against loss and against unauthorized access, use, collection, storage, maintenance, disclosure, transfer, modification or other misuse, and the Knowledge of the Company, there has been no unauthorized access, use, collection, storage, maintenance, disclosure, transfer, modification or other misuse of such personally identifiable information. None of the Companies has not received a written complaint regarding its collection, use or disclosure of personally identifiable information.

2.23.3  Each Company holds all material permits, licenses, franchises, approvals, authorizations, registrations, certifications, qualifications, memberships, variances and other rights required by any Legal Requirement or any Governmental Authority necessary to own or lease, operate and use its assets and carry on

and conduct its businesses as currently conducted (collectively the "Governmental Authorizations"). Set forth on Schedule 2.23.3 is an accurate and complete list of all of the Governmental Authorizations. Each of the Governmental Authorizations is valid and in full force and effect, and the consummation of the transaction will not terminate or adversely affect any of the Governmental Authorizations.

2.23.4  Except as set forth on Schedule 2.23.3, to the Knowledge of the Company, each Company is currently, and at all times has been, (i) in compliance in all material respects with all of the terms and requirements of each of the Governmental Authorizations, (ii) no conditions have been imposed in relation to any of the Governmental Authorizations, and, to the Knowledge of the Company, no event has occurred or circumstance exists that, with or without notice or lapse of time or both, would give rise to, or serve as a basis for, the revocation, withdrawal, suspension, variation or non-renewal of any of the Governmental Authorizations, and (iii) all applications required to have been filed for the renewal of each of the Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities. Schedule 2.23.3 shall include all Department of Transportation approvals and awards granted to Multi-Aero during the five year period preceding the Effective Date of this Agreement.

2.24  CHANGES IN BUSINESS. Except as noted in Schedule 2.24, since December 31, 2021 there has not been:

2.24.1  Any adverse change in the financial condition, assets, liabilities, business, or operations of the Companies other than changes in the ordinary course of their business, none of which has (either when taken by itself or in conjunction with all other such changes) been materially adverse;

2.24.2  Any damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the business of the Company and/or its Subsidiaries, or any Aircraft;

2.24.3  Any increase or decrease in the rates of compensation payable to or to become payable by any Company to any of their officers, employees or agents over or under the rates in effect during the twelve months ended December 31, 2021, other than general increases made in accordance with past practices;

2.24.4  Any amendment or termination of any Material Contract, agreement, plan, lease, or license to which any of the Companies is a party or by which they may be bound;

2.24.5  Any disposition, mortgage, pledge or subjection to any lien, claim, charge, option, or encumbrance of any property or asset of the Companies, or any cancellation or compromise of any debt or claim of the Companies otherwise than in the ordinary course of business;

2.24.6 Any dispute or threat of a dispute or any attempt or threat of an attempt by a labor union to organize the employees of the Companies;

2.24.7 Any material change in the sources of supply or methods of doing business of the Companies;

2.24.8 Any loss (or threat of a loss) of a material customer of the Companies, other than as disclosed by the Department of Transportation in awarding Essential Air Service contracts;

2.24.9 Any incurrence or extension of indebtedness for borrowed money with respect to the Companies;

2.24.10 Any change in the accounting methods of the Companies except changes agreed to with the Purchaser prior to Closing;

2.24.11 Any commitment to pay any severance or termination pay to any of the employees of each Company;

2.24.12 Any guarantee by the Companies of any indebtedness except as disclosed in Schedule 2.24.12;

2.24.13 Any direct or indirect acquisition by the Companies of the assets or capital stock of another business entity;

2.24.14 Any distribution or disposition of the assets of the Companies other than in the ordinary course of business;

2.24.15 Any event such as (but not limited to) fire, explosion, earthquake, accident, flood, strike, work stoppage, cancellation or threatened cancellation of insurance policies, condemnation, act of God or public enemy, riot, or civil disturbance materially and adversely affecting any Company;

2.24.16 Any declaration or payment of a dividend in cash or other property by any Company, any purchase or redemption of capital stock by the Companies or any other distribution with respect to their capital stock; or

2.24.17 Any event outside of the ordinary course of business with respect to the Companies.

2.25  ENVIRONMENTAL MATTERS. Other than fuel, oil, engine additives, cleaning supplies (not in bulk), the Companies, on property owned or occupied by any of them, has ever generated, manufactured, refined, transported, treated, stored, handled or disposed of hazardous substances or hazardous wastes as defined in federal or state statutes or regulations affecting environmental matters nor has any such property ever been so used.

2.26   CUSTOMERS. Except for the Department of Transportation as set forth on Schedule 2.15 and Schedule 2.26, no single customer is of material importance to the business of the Companies. For purposes of this Section 2.26, a customer shall be deemed to be of "material importance" only if it represents more than 20% of a Company's consolidated sales. The relationships of each Company with the customers and suppliers set forth on Schedule 2.26 are such that the Shareholders have no reason to believe, other than Department of Transportation EAS Orders period awarding, reauthorizing, or selecting a company other than the Companies, that any such customer is planning any action which will be materially adverse to the profitability, business or financial condition of such Company. No such customer has cancelled or threatened to cancel its relationship with the Companies or, during the last 12 months, decreased or threatened to decrease the extent of such relationships or made any material warranty claims.

2.27   FINANCIAL STATEMENTS.

2.27.1  The Shareholders have delivered to the Purchaser (i) balance sheets of the Companies as of June 30, 2021 and 2020; (ii) related statements of income, stockholders' equity and changes in financial position for the years ended June 30, 2021 and 2020, and (iii) statements of income, stockholders' equity, and changes in financial position for the year ended June 30, 2021 and 2020, together with related notes to such financial statements. A complete and accurate copy of such financial statements and notes (collectively, the "Financial Statements") is annexed hereto as Schedule 2.27.

2.27.2  The Financial Statements fairly present the financial position of the Company as of June 30, 2021 and 2020, and the results of the Companies' operations and the changes in its financial position for the years ended June 30, 2021 and 2020. The Financial Statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved and consistently with the preceding fiscal year of the Company.

2.27.3  Except as set forth in Schedule 2.27.3 annexed hereto, the fair market value of each asset category shown on the balance sheets included within the Financial Statements was not less than the amount shown on such balance sheets for each such category as of the date of such balance sheets, less the reserve for depreciation and the allowance for doubtful accounts.

2.27.4  No tangible asset included in the balance sheets included within the Financial Statements has been valued in excess of its cost less depreciation.

2.27.5  Any marketable securities set forth on the balance sheets included in Schedule 2.27 have been valued at the lower of cost or market.

2.27.6  The Company's fixed assets as set forth in Schedule 2.27 have been depreciated on a consistent basis.

2.27.7  No value has been assigned in the balance sheets included in Schedule 2.27 to (a) good will, trademarks, trade names, contract rights, customer lists, books and records or restrictive covenants, (b) any asset previously charged to expense; or (c) any other asset which it has been the practice of the Companies to write off as an expense.

2.27.8  There are no Multi-Aero liabilities as of June 30, 2021 that are not reflected and disclosed on the June 30, 2021 balance sheet included in Schedule 2.27 (the "June 30, 2021 Balance Sheet"). Except for liabilities incurred in the ordinary course of their business subsequent to June 30, 2021, or disclosed in Schedule 2.27.8, none of the Companies has incurred any liabilities whatsoever in addition to those reflected in or disclosed on the June 30, 2021, Balance Sheet.

2.27.9  Adequate reserves have been created on the June Balance Sheet for (a) all reasonably foreseeable losses and costs in excess of anticipated income with respect to all contracts and commitments to which any Company is a party or by which it is bound and (b) any damage, destruction or loss not covered by insurance.

2.27.10  Each Company has at all times kept full and complete books and records, both consistently and in accordance with generally accepted accounting principles.

2.27.11  All representations set forth herein with respect to the Financial Statements shall also be true with respect to the financial statements to be delivered to the Purchaser pursuant to Section 2.27.1 hereof.

28.     SHAREHOLDERS' STOCK.

2.28.1  The Shareholders own 100% of the issued and outstanding capital stock of the Company.

2.28.2  Each Shareholder owns beneficially and of record, free and clear of any lien or other encumbrance, and has full power and authority to convey free and clear of any lien or other encumbrance, the Common Stock set forth opposite his or its name in Section 4.1 hereof. On the Closing Date, the Purchaser will acquire good and valid title thereto, free and clear of any lien or other encumbrance.

2.28.3  Each Shareholder has the full legal right and power and all authority and approvals required to enter into, execute and deliver this Agreement and to perform fully such Shareholder's obligations hereunder. This Agreement has been duly executed and delivered by each Shareholder and constitutes the legal, valid and binding obligations of such Shareholder enforceable against such Shareholder in accordance with its terms, subject, as to enforceability, to applicable bankruptcy, moratorium, reorganization and other laws generally affecting the rights of creditors and to applicable equity principles. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and thereby and the performance by each Shareholder of this Agreement will not (i) require the approval or consent of any federal, state, county, local or

other governmental or regulatory body or the approval or consent of any person not an express party to this Agreement; (ii) conflict with or result in any breach or violation of any of the terms and conditions of, or constitute (or, with notice or lapse of time or both, would constitute) a default under, any certificate of incorporation, by-law, statute, regulation, or order, judgment or decree applicable to any Shareholder or to the Common Stock held by any Shareholder or to any instrument, contract or other agreement to which any Shareholder is a party or by or to which any Shareholder or such Common Stock is bound or subject; or (iii) result in the creation of any lien, charge, claim or other encumbrance on the Common Stock held by any Shareholder.   Each of the Shareholders has executed a shareholders' agreement (the "Shareholders' Agreement") pursuant to which each of the Shareholders has appointed I. Shane Storz (the "Representative"), as their attorneys-in-fact to execute this Agreement on their behalf, execute and/or deliver stock certificates, stock powers and other certificates and documents on their behalf, execute   receipts on their behalf and generally take all actions on their behalf required to be taken pursuant to this Agreement.A true copy of the Shareholders' Agreement is set forth in Schedule 2.28.

2.29.   VIOLATION OF OTHER INSTRUMENTS. Neither the execution nor the consummation of this Agreement will, with or without notice or the passage of time, or both, conflict with, violate or result in a breach of or lien, default or liability under any term or provision of the certificates of incorporation or by-laws of any Company , any statute, regulation, order, judgment or decree, or any indenture, contract, agreement, note, mortgage or other instrument to which the Company or any of it Subsidiaries is a party or by which it or they are bound. True, correct and complete copies of the certificates of incorporation and by-laws of each Company, as amended to date, have been delivered to the Purchaser and to Purchaser's Counsel at the addresses set forth in Section 11.0 hereof.

2.30   TAX DISCLAIMER. Shareholders acknowledge that they have entered into this Agreement in reliance upon advice from their own representatives as to the tax effects of this Agreement. The Purchaser shall not have any responsibility or liability to Shareholders for the tax consequences hereof.

2.31   LONG-TERM DEBT. Schedule 2.31 annexed hereto is a list setting forth, with respect to all outstanding long-term debt of each Company, the aggregate principal amount of indebtedness outstanding on the date hereof, the name of the lender, the interest rate (or interest rate formula), the maturity date, a description of the collateral and the date of the related loan agreement. Except as stated on Schedule 2.31, consummation of the transactions contemplated by this Agreement will not give any lender the right to accelerate the time in which any such long-term debt is payable by such Company or constitute a default under any related agreement or instrument. A true and complete copy of each loan agreement relating to the long-term debt listed in Schedule 2.31 has been delivered to the Purchaser and Purchaser's Counsel at the addresses set forth in Section 11.0 hereof. No Company is in default under any such long-term debt or loan agreement or, upon the giving of notice and/or the lapse of time, would be in default thereunder.

2.32   FINANCING STATEMENTS.   Schedule 2.32 annexed hereto contains true and complete copies of all financing statements executed by the Companies with respect to any property they own or leas, other than financing statements and mortgages terminated in accordance with law.

2.33   BROKERAGE. The Shareholders know of no broker or finder who has rendered services or was engaged to provide services in connection with this Agreement.

2.34   SCHEDULES. All the facts recited in Schedules annexed hereto shall be deemed to be representations to the best of their knowledge of fact as though recited in this Section 2.

2.35   FULL DISCLOSURE. No representation or warranty made by the Shareholders in this Agreement and no certification furnished or to be furnished to the Purchaser pursuant to this Agreement contains or will contain any untrue statement of a material fact or omits, or will omit, to state a material fact necessary to make the statements contained herein or therein to the best of their knowledge not misleading.

2.36   CONTINUING REPRESENTATIONS. Unless the Shareholders advise the Purchaser to the contrary prior to the Closing Date, all of the representations and warranties made hereunder shall to the best of their knowledge be deemed true at and as of the Closing Date.

3.0   REPRESENTATIONS AND WARRANTIES OF THE PURCHASER. The Purchaser hereby represents and warrants to the Shareholders that:

3.1 ORGANIZATION. The Purchaser is duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the corporate power to execute, deliver, and perform this Agreement.

3.2 NO THIRD PARTY CONSENTS REQUIRED. Neither the execution nor the performance of this Agreement by the Purchaser requires the consent of any third party nor will it constitute a breach of any provision of, nor a default under, any indenture, mortgage, term loan, or credit agreement to which the Purchaser is a party or by which it may be bound.

3.3   LITIGATION.   There are no demands, actions or investigations (formal or informal), nor any Proceeding, pending or threatened against Purchaser, any of its properties or assets or the operation thereof or any of its officers or directors before any Governmental Authority, other than actions, investigations or Proceedings that are immaterial to the Purchaser.

3.4 AUTHORIZATION. This Agreement has been approved by the Board of Directors of the Purchaser and has been duly authorized, executed and delivered by and on behalf of the Purchaser. This Agreement represents a valid and binding obligation of the Purchaser enforceable in accordance with its terms.

3.5 BROKERAGE. The Purchaser knows of no broker or finder who has rendered services or was engaged to provide services in connection with this Agreement.

3.6 FULL DISCLOSURE. No representation or warranty made by the Purchaser in this Agreement, and no certificate furnished or to be furnished by the Purchaser pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits, or will omit, to state a material fact necessary to make the statements contained herein or therein not misleading.

4. ACQUISITION PROVISIONS.

4.1 TRANSFER AND ASSIGNMENT OF SHARES. On the Closing Date, subject to the terms and conditions set forth in this Agreement, each Shareholder shall convey, transfer, assign and deliver to the Purchaser, and the Purchaser shall purchase from each Shareholder, the number of shares of Common Stock set forth opposite such Shareholder's name below:

| Name of Shareholder | Number of Shares of Common Stock |
|---|---|
| Darlene Storz, Trustee, of the Darlene Storz Living Trust Dated July 9, 1997, as Amended November 8, 2013 | 9,000 shares |
| Ivan Shane Storz, Trustee, of the I. Shane Storz Trust Dated January 13, 2016 | 9,000 shares |
| S. Darnea Wood | 9,000 shares |

Such transfer shall be effected by delivering to the Purchaser, at the Closing, stock certificates representing such shares and duly executed stock powers, in form and substance satisfactory to Purchaser, with signatures guaranteed by either (i) a commercial bank, (ii) a member of the New York or American Stock Exchanges or (iii) I. Shane Storz.

4.2 GOOD TITLE. The Shareholders agree to convey to the Purchaser at the Closing good and marketable title to all shares referred to in Section 4.1 hereof free and clear of all liens, security interests, encumbrances, claims and restrictions whatsoever.

4.3 CONSIDERATION.

4.3.1 The consideration for all of the Common Stock shall be, in the aggregate amount of $4,200,000, payable in seven (7) payments by wire transfer to Seller's counsel as follows: $3,600,000 at Closing by wired funds with $600,000 wire transferred to

be placed in escrow account of Seller's counsel, Steven H. Akre, Esq. Seller's counsel shall disburse to Sellers in six (6) equal installments of $100,000 on April 30, 2022, May 31, 2022, June 30, 2022, July 31, 2022, August 31, 2022, and September 30, 2022.    Provided, however, any such installment payment may be offset for liabilities arising prior to Closing and/or breach of representations and no installment payment shall be disbursed by Seller's Escrow Agent without written authorization from both Purchaser and Seller.

4.3.2   At the Closing, in addition to the amounts set forth in Section 4.3.1, at the Closing, (ii) Purchaser shall pay Sellers an amount equal to twenty percent (20%) of the amount transferred to Purchaser from Sellers as prepaid ticket sales as of March 31, 2022; (ii) the parties shall adjust and refund to Sellers any prepaid insurance as of March 31, 2022; and (iii) Purchaser shall permit the withdrawal of DOT EAS funding payment earned by and due Seller in the month of March, 2022, and upon Seller's withdrawal of such funds, Seller will relinquish and cease all control and access to this transition bank account to Purchaser.

4.4    CASH PAYMENTS. The cash payment to be made pursuant to Section 4.3.1 shall made to the Missouri IOLA Client Trust Account of Steven Akre, Esq. ("Seller Escrow Agent").   Wire instructions to be provided by Purchaser prior to Closing. The cash payments to be made pursuant to Section 4.3.1 shall be made by Purchaser wire transferring payment of $4,200,000 to be disbursed by Seller's Escrow Agent in said seven (7) installment payments pursuant to Section 4.3.1. In each instance, the Attorney Escrow Agent shall thereupon be responsible for dividing such amount or amounts among the Shareholders in accordance with this Section 4.4.  Purchaser, at Closing, shall wire to Purchaser Escrow Agent $4,200,000 to be disbursed to Seller's Attorney Escrow Agent in three (3) installment disbursement dates pursuant to Section 4.3.1.

4.5    LEASE AND ACQUISITION OF AIRCRAFT.  At or prior to Closing, Aircraft Leases and Delivery and Acceptance forms in the form and substance set forth in Schedule 4.5 shall have been executed and delivered to Sellers.

4.6    EXCLUDED ASSETS AND LIABILITIES. Schedule 4.6 sets forth the assets and liabilities that shall be retained by the Shareholders.

5.    ADDITIONAL   COVENANTS   AND   AGREEMENTS   OF   THE SHAREHOLDERS.

5.1 ACCESS TO PREMISES AND INFORMATION.  The Shareholders shall cause the Companies to permit the Purchaser and its authorized representatives to have full access (subject to the terms of any confidentiality agreement previously executed by the Purchaser) to the premises, books, and records of each Company and will cause each Company to furnish (subject to the terms of any confidentiality agreement previously executed by the Purchaser) the Purchaser and such representatives with such financial and operating data and other information with respect to the business and properties of each Company as the Purchaser shall reasonably request, both before and after the Closing Date. No investigation or inquiry made by the Purchaser pursuant to this Agreement shall in any

way affect or lessen the representations and warranties made herein by the Shareholders.

5.2  CONDUCT OF BUSINESS PENDING CLOSING.  The Shareholders shall take all steps necessary to assure that the conditions set forth in Sections 7.1 and 7.10 hereof are satisfied at all times from the date hereof through the Closing Date.

5.3  CONSENT TO TRANSFER OF MATERIAL CONTRACTS. To the extent that any contract, lease, loan agreement or commitment listed in Schedules 2.7, 2.8, 2.15 or 2.31 annexed hereto or referred to in Sections 2.7, 2.8, 2.15 or 2.31 should require the consent of any party thereto to the transactions described herein prior to the consummation thereof, the Shareholders shall obtain such consent and deliver such consent to the Purchaser at or prior to the Closing. The Shareholders warrant that Schedule contains a complete list of all such consents.

5.4  DEPARTMENT  OF  TRANSPORTATION.  The  Shareholders recognize the Purchaser will be required to report the Department of Transportation.  In this regard, the Purchaser has informed the Shareholders that certain information must be submitted by Purchaser and Multi-Aero; both parties agree to cooperate and provide such information and further acknowledge time is of the essence.

6.0   THE CLOSING

6.1   THE CLOSING. The Closing shall take place at 10:00 a.m. at the offices of Steven Akre, or such other location agreed between the parties, on the later of (i) March 31, 2022, and (ii) the fifth business day after the parties hereto have agreed that the Schedules, information and documents annexed therein are acceptable, provided that all conditions precedent to the obligations of the parties hereto to close have then been met or waived. In the event that all such conditions have not been satisfied by the date set for Closing, either party shall have the right (exercisable by delivering notice to the other parties hereto on or before the Closing Date) to reschedule the Closing Date to a date (the "Rescheduled Date") not later than 15 days after the Closing Date.

6.2   TRANSFER OF TITLE.  On the Closing Date, the Shareholders will transfer all of the shares of capital stock to the Purchaser by individual assignments which, in the reasonable opinion of the Purchaser, shall be sufficient to vest in the Purchaser good and marketable title to said shares.

6.3   FURTHER ASSURANCES.   At any time and from time to time after the Closing Date, (i) at the Purchaser's reasonable request, the Shareholders will duly execute, acknowledge, and deliver all such further and other assurances and documents and will take such other action consistent with the terms of this Agreement as may reasonably be requested by the Purchaser for the purpose of better assigning, transferring, and conveying to the Purchaser, or reducing to its possession, any or all of the Company's shares and assets; and (ii) at the Shareholders' reasonable request.  Purchaser will permit Shareholder(s) or their representative access to the Companies' information and records for tax, aircraft, or other matters.

6.4 PROCEDURE ON TERMINATION. If any party shall refuse to close because all the conditions precedent to its obligations to close shall not have been met, it may terminate this Agreement by giving notice of such termination to the other party, provided, however, that in the event that any party exercises its right under Section 6.1 hereof to defer the Closing Date, such notice may not be given unless such conditions have not been met by the Rescheduled Date. Except in the event of the termination of this Agreement pursuant the immediately following sentence, upon the giving of any such notice, this Agreement (except this Section 6.4 and Section 10.2 hereof) shall terminate, a termination fee of $10,000 shall be paid by Purchase to Sellers (the "Termination Fee"), Seller shall have no further obligations or liability with respect to this Agreement, and this Agreement shall be of no further force and effect. Purchaser shall not be required to pay the Termination Fee if this acquisition does not close for any reason other than:  (i) failure by Seller to fulfill the conditions precedent, (ii) termination of this Agreement by Sellers, (iii) termination by Purchaser due to a change in the terms set forth herein by Sellers, or (iv) the failure by Sellers to maintain its business. .  Promptly upon the termination of this Agreement, each party shall return to the other any documents or property theretofore received hereunder, and thereafter (subject to the terms of any confidentiality agreement previously executed by the Purchaser) each party shall be mutually released and discharged from liability to the other parties or to any third parties with respect to any claims arising hereunder other than liabilities covered by Section 10.2 hereof, and no party shall be liable to any other party for any costs or expenses paid or incurred in connection herewith.

7.0 CONDITIONS OF THE PURCHASER'S OBLIGATION TO CLOSE. The obligations of the Purchaser hereunder are subject to the satisfaction, on or prior to the Closing Date, of all the following conditions, compliance with which or the occurrence of which may be waived in whole or in part by the Purchaser in writing.

7.1 CONDUCT PRIOR TO CLOSING.  Except as set forth in the Schedules attached hereto, during the period from the date hereof through the Closing Date:

7.1.1 Each Company shall have carried on their business diligently and substantially in the same manner as heretofore and shall not have instituted any unusual or novel methods of purchase, sale, manufacture, management, or operation of their properties or their business;

7.1.2 No Company shall have made any direct or indirect redemption, purchase, or other acquisition of any of its capital stock;

7.1.3 No Company shall have issued or agreed to issue any shares of their capital stock, any options, rights or warrants to purchase their capital stock or any instruments convertible into their Common Stock;

7.1.4 No Company shall have incurred any liability or obligation, made any commitment or disbursement, acquired or disposed of any property or asset, made any contract or agreement, or engaged in any transaction, except in the ordinary course of

[20]

their business;

7.1.5 No Company shall have issued any purchase order for goods or services, entered into any contract requiring any of them to sell products or render services or made any capital commitments or purchases, except in the ordinary course of their business;

7.1.6 No Company shall have subjected any Company assets to any lien, claim, charge, option or encumbrance;

7.1.7 No Company shall have increased or decreased the rate of compensation of or other than one-time pre-closing bonuses to Sellers and employees, paid any unusual compensation to any employee or consultant and shall not have entered into any agreement to increase or decrease the rate of compensation of or to pay any unusual compensation to any such employee or consultant;

7.1.8 Each Company shall not have entered into any collective bargaining agreement, or created or modified any pension or profit-sharing plan, bonus, deferred compensation, death benefit, or retirement plan, or the level of benefits under any such plan nor will it have in- creased or decreased any severance or termination pay benefit or any other fringe benefit;

7.1.9 Each Company shall have continued in effect their present insurance coverage on all properties, assets, business and personnel;

7.1.10 Each Company shall have used their best efforts to preserve their business organizations intact, to keep available their present employees, and to preserve their present relationships with suppliers, franchisors, and customers and others having business dealings with them;

7.1.11 Unless with the prior advance written consent of the Purchaser, none of the Companies nor any Shareholder shall have made any representation (except with respect to the employment agreement described in Section 7.5 hereof) to anyone indicating any intention to retain, institute, or provide any employee benefit plans or represent in any manner that any officer or employee of the will be employed by any of the Companies after the Closing;

7.1.12 No Company shall have done anything and shall not have failed to do anything which will cause a breach of or default under any contract, agreement, commitment, or obligation to which any of them is a party or by which any of them may be bound;

7.1.13 Each Company shall have kept full and complete books and records, both consistently and in accordance with generally accepted accounting principles; and

7.1.14  Each Company shall not have loaned any funds to any of their employees or guaranteed the indebtedness of any of their employees.

## 7.2  REPRESENTATIONS, WARRANTIES AND COVENANTS.

7.2.1  All representations and warranties of the Shareholders contained in this Agreement and the schedules annexed hereto shall to the best of their knowledge be correct and true as of the Closing Date and all covenants and conditions to be performed or met by the Company, the Subsidiaries and the Shareholders on and before the Closing Date shall have been performed or met.

7.2.2  On the Closing Date, the Shareholders shall furnish to the Purchaser a certificate (in form and substance reasonably satisfactory to the Purchaser), dated the Closing Date, to the effect that all representations and warranties of the Shareholders contained in this Agreement and the annexed schedules are in all material respects to the best of their knowledge correct and true as of the Closing Date and that all covenants and conditions to be performed or met by Multi-Aero, the Subsidiaries, and the Shareholders prior to Closing have been so performed or met. Said certificate shall be signed by or on behalf of each Share- holder. The delivery of such certificate shall in no way diminish the warranties and representations of the Shareholders made in this Agreement.

7.2.3  The Purchaser shall not have discovered any material error, misstatement, or omissions in any of the representations or warranties made by the Shareholders herein or any material failure to perform or satisfy any covenants or conditions to be performed or met by the Company, the Subsidiaries or the Shareholders.

7.3  OPINION OF COUNSEL. The Shareholders shall have furnished the Purchaser with a favorable opinion, dated the Closing Date, of Steven H. Akre, PC, counsel to the Company and the Shareholders (in form and substance reasonably satisfactory to the Purchaser and Purchaser's Counsel) to the effect that:

7.3.1  Each Company  is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has all requisite corporate power, franchises and licenses to own property and conduct the business in which it is engaged.

7.3.2  Each Company is qualified to do business in each state in which the character of their respective business conducted.

7.3.3  Except as set forth in <u>Schedule 7.3</u> annexed hereto, the consummation of the transactions contemplated by this Agreement will not result in a material breach of any term or provision of, or constitute a material default or result in a material lien or liability under, the articles of incorporation or by-laws of any of the Shareholders, the Companies, or any law, statute, ordinance, judgment, order or decree, or any indenture, agreement, instrument, or understanding known to such counsel to which the Company, any of its Subsidiaries or any Shareholder is a party or by which it is bound.

7.3.4  To the best knowledge of such counsel, no consent or other agreement of any person is required for the transfer and assignment of the Common Stock pursuant to this Agreement or, if required, all such consents and agreements have been duly obtained by the Shareholders and the stock powers and stock certificates tendered to the Purchaser at the Closing are in all material respects in compliance with this Agreement and are sufficient to vest the Purchaser with good title to all of the issued and outstanding shares of capital stock of the Companies.

7.3.5  No consent, approval, authorization, or order of any governmental agency or body (or, to the best knowledge of counsel, of any court), not obtained and in effect on the Closing Date, is required for the execution, delivery, and performance of this Agreement by the Shareholders or the consummation of the transactions contemplated by this Agreement.

7.3.6  Except as set forth in Schedule 7.3 annexed hereto, no consent, approval, or authorization of any party to any material lease, loan agreement or contract known to such counsel after due inquiry not obtained and in effect on the Closing Date is required for the continued validity and enforceability of such leases, loan agreements or contracts after consummation of the transactions contemplated by this Agreement.

7.3.7  This Agreement, the Shareholders' Agreement, the employment and independent consultant agreements described in Section 7.5 hereof have been duly and validly authorized, executed, and delivered by or on behalf of each Shareholder or employee, are valid and binding agreement of each Shareholder or employee and are enforceable in accordance with their terms, subject, as to enforceability, to applicable bankruptcy, moratorium, reorganization and other laws generally affecting the rights of creditors and to applicable equity principles. All corporate action on the part of the Companies required to consummate the transactions contemplated by this Agreement have been taken.

7.3.8  To the best knowledge of such counsel, the representations set forth in Section 2.17 and 2.23 hereof are accurate as of the Closing Date and no suit, proceeding or litigation is pending or threatened which, if successful, would preclude or materially affect consummation of the transactions described herein.

7.3.9  The Company is only authorized to issue 30,000 shares of Common Stock, of which 27,000 shares are issued and outstanding. All of the issued shares of Common Stock have been fully paid and validly issued, are nonassessable and have been issued without violating the preemptive rights of any person or entity and without violating any law, rule or regulation, and are not subject to any right of first refusal or similar right. To the best of such counsel's knowledge, the Company does not have outstanding any options or warrants to purchase, or contracts to issue, or contracts or any other rights of any nature entitling anyone to acquire, shares of the Company's capital stock of any class or kind, or securities convertible thereinto.

7.3.10 To the best of such counsel's knowledge, each of the Shareholders has good and marketable title to the shares of Common Stock to be sold by each Shareholder hereunder and full power, right and authority to sell such shares. Upon the delivery of the amount payable pursuant to Section 4.3.1 hereof, the Purchaser will receive good and marketable title to such shares, free and clear of any mortgage, pledge, lien, security interest, encumbrance, claim or equity (assuming that the Purchaser is without notice of any defect in the title of the Shareholders to such shares).

7.4   ABSENCE OF LITIGATION. No inquiry or investigation by any federal or state regulatory agency having jurisdiction over any Company shall have been threatened or instituted and no action or proceeding shall have been threatened or instituted prior to or on the Closing Date before any court or governmental body or authority with respect to the transactions contemplated hereby.

7.5   EMPLOYMENT AGREEMENT; NON-COMPETE AGREEMENT. At or prior to the Closing, (i) I. Shane Storz shall have executed and delivered an employment agreement with the Purchaser in the form of the agreement set forth in Schedule 7.5(i) annexed hereto and (ii) Darnea Wood shall have executed an independent contractor agreement with the Purchaser in the form of the agreements set forth in Schedule 7.5(ii) annexed hereto, and (iii) each of them shall have delivered to the Purchaser a non-competition agreement in the form of the agreement set forth in Schedules 7.5(iii) annexed hereto.

7.6 CONSENTS TO ASSIGNMENTS. On or prior to the Closing Date, the Shareholders shall furnish the Purchaser with each of the consents described in Schedule 5.3.

7.7 APPROVAL OF DOCUMENTATION. The form and substance of all opinions, certificates, instruments of transfer, and other documents to be delivered hereunder shall be satisfactory in all reasonable respects to the Purchaser and Purchaser's Counsel.

7.8   RESIGNATION OF DIRECTORS. The Shareholders represent that the current Boards of Directors of each Company are as set forth on Schedule 7.8. All such directors shall have resigned as of the Closing Date so as to be replaced by nominees selected by the Purchaser.

7.9   ABSENCE OF DEBT/GUARANTEES. On the Closing Date, no amounts shall be owed to any Company by the Shareholders or any employees thereof.

7.10 MANAGEMENT. During the period commencing on the date of the balance sheet to be delivered pursuant to Section 4.5 hereof and terminating on the Closing Date, no material transaction involving any of the Companies shall have been taken without the Purchaser's approval.

8.0 CONDITIONS OF THE SHAREHOLDERS' OBLIGATION TO CLOSE. The obligations of the Shareholders hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions, compliance with which, or the occurrence of which, may be waived in whole or in part in writing on behalf of the Shareholders.

8.1   REPRESENTATIONS, WARRANTIES, AND COVENANTS. All representations, warranties, and covenants of the Purchaser contained in this Agreement shall be true as of the Closing Date and the Purchaser shall have performed and satisfied all covenants and conditions of this Agreement to be performed or satisfied by the Purchaser at or prior to the Closing Date.

8.2   OPINION OF COUNSEL. The Purchaser shall have furnished the Shareholders with an opinion, dated the Closing Date, of Purchaser's Counsel (in form and substance satisfactory to the Shareholders and their counsel) to the effect that:

8.2.1   The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the requisite power to perform its obligations pursuant to this Agreement.

8.2.2   The Board of Directors of the Purchaser has authorized and approved the execution and delivery of this Agreement, and all corporate action necessary or proper to effectuate the fulfillment of its obligations hereunder has been taken and no other corporate action is required.

8.2.3   This Agreement has been duly and validly authorized, executed, and delivered by the Purchaser and is a valid agreement enforceable against the Purchaser in accordance with its terms, subject, however, to applicable bankruptcy, moratorium, reorganization and other laws generally affecting the rights of creditors and to applicable equity principles.

8.2.4   No consent, approval, authorization, or order of any governmental agency or body (or, to the best knowledge of counsel, any court) not obtained and in effect on the Closing Date is required for the consummation by the Purchaser of the transactions contemplated by this Agreement.

8.3   APPROVAL OF DOCUMENTATION. The form and substance of all opinions, certificates, instruments of transfer, and other documents to be delivered hereunder by the Purchaser shall be satisfactory in all reasonable respects to the Shareholders and their counsel.

8.4   INDEMNITY. The Purchaser shall furnish to the Shareholders indemnification agreements in the form of the indemnification agreement annexed hereto as Schedule 8.4, pursuant to which the Purchaser shall indemnify such persons for any claims made against such persons pursuant to the guarantees set forth in Schedule 8.4 annexed hereto.

## 9.0  POST-CLOSING COVENANTS.

9.1   NO COMPETITION/NONDISCLOSURE. Except to the extent described in Schedule 9.1, the Shareholders agree each Shareholder will not, for a period of five (5) years for I. Shane Storz and three (3) years for Darnea Wood after the later of (a) the Closing Date and (b) the date of the termination of their employment with the Purchaser, Multi-Aero, or with any of their respective Subsidiaries, or with any of their successors, directly or indirectly, in any capacity whatsoever, engage in any business in the form and substance set forth in Schedule 9.0 annexed hereto presently conducted by the Companies in any geographic area in which they are presently conducting that business or in which they or their successors are conducting business on the date of termination of such Shareholder's employment. The Shareholders shall not at any time (i) disclose or furnish to any third parties any confidential information concerning any of the Companies, (ii) cause, induce or encourage any person employed by any of the Companies to leave such employ or (iii) disrupt or interfere with the relationship between the Purchaser, the Company and any of their customers or suppliers.

9.2   NON-DISPARAGEMENT. The Parties hereto agree that they shall not at any time directly or indirectly disparage the other party in any material respect, any affiliate or principal of the foregoing, or any of their respective businesses. Neither party shall not at any time intentionally disparage any other party in any material respect or any affiliate or principal of the foregoing, or any of their respective businesses. This Section 9.2 shall not apply to (i) testimony obtained through subpoena or (ii) any information provided pursuant to an investigation by any Governmental Authority.

9.3   COVENANTS. The parties agree that the covenants contained in this Section 9 (the "Restrictive Covenants") are of the essence of this Agreement and that if any such covenants are violated, monetary damages would be inadequate and the injured party shall be entitled to injunctive relief, as a matter of right, and to all other remedies and rights to which such party might be entitled at law or in equity and under this Agreement. The parties acknowledge that the covenants contained in this Section 9.1 are reasonable and are necessary to protect the Purchaser's investment and Shareholders' good characters and names. Each Party has consulted with legal counsel regarding the Restrictive Covenants and based on such consultation has determined and hereby acknowledges that the Restrictive Covenants are reasonable in terms of duration, scope and areas restrictions and are necessary to protect the goodwill of the Purchaser and their businesses and the substantial investment in such businesses and the Companies made by Purchaser. Each party further agrees that it will not challenge the reasonableness of the duration, scope and area restrictions in any action with respect to the Restrictive Covenants, regardless of who initiates such action. Nevertheless, should a court of competent jurisdiction hold any of the foregoing covenants to be unreasonable with respect to duration or territorial scope, or both, Purchaser and the Shareholders consent to the reduction of the applicable time and/or territorial scope of any covenants to the maximum period of time and/or territorial scope as permitted by applicable law. It is understood that each of the covenants set forth in this Section 9 are severable; unenforceability of any of such covenants in whole or in part shall not affect the enforceability of the remaining covenants or this Agreement.

9.4     TAXES. The Shareholders shall pay any federal, state or local taxes which are imposed on the Shareholders or the Company as a result of the sale of stock hereunder or imposed with respect to the payments to be made pursuant to Section 4.3.2 hereof.

9.5     PRESS RELEASE. The Purchaser and Sellers will be obligated to issue a press release promptly disclosing the Closing execution. The Shareholders and the Purchaser shall not issue any press release or public communication about this transaction unless and until the form of such release has been approved by the Purchaser and the Shareholders. No such approval shall be unreasonably withheld, conditioned or delayed.

10.0    SURVIVAL OF REPRESENTATIONS AND INDEMNIFICATION.

10.1  SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All statements contained in any schedule or certificate or other instrument delivered or to be delivered by or on behalf of the parties hereto, or in connection with the transactions contemplated hereby, shall be deemed representations and warranties hereunder. All such representations, warranties, and agreements shall survive the Closing and any audit or investigation made by or on behalf of the parties. Consummation of the transactions contemplated hereby shall not be deemed or construed to be a waiver of any right or remedy possessed by any party hereto, notwithstanding that such party knew or should have known at the time of Closing that such right or remedy existed.

10.2  INDEMNIFICATION.

10.2.1  Shareholders jointly and severally agree to and do hereby indemnify and hold the Purchaser harmless against any claims, losses, expenses, obligations, deficiencies, liabilities, and lawsuits (including reasonable attorneys' fees) which arise or result from or are related to (a) any material breach or failure of the Shareholders, or any Company to perform any of their covenants or agreements set forth herein, (b) the material inaccuracy of any representation or warranty made by the Shareholders herein, or (c) any material obligation or liability of each Company which is not specifically disclosed to the Purchaser pursuant to this Agreement, provided that any claim with respect to the material inaccuracy of any representation or warranty is communicated to the Representatives within two (2) years after Closing. Notwithstanding the foregoing, (i) the maximum aggregate liability which the Shareholders shall have to the Purchaser with respect to the material inaccuracy of representations and warranties herein shall equal the aggregate amount of payments which the Purchaser is required to make pursuant to Section 4.3 hereof; (ii) the maximum personal liability of each Shareholder pursuant to this Section shall be limited to an amount equal to the product of such person's percentage ownership of the stock in the Company and the aggregate amount for which the Purchaser shall be entitled to indemnification pursuant hereto; and (iii) the Purchaser shall not be entitled to indemnification for any loss sustained as a result of the non-disclosure of a material obligation or liability if, and to the extent that, the obligation or liability is covered by an insurance policy maintained by the Company or the Purchaser and the insurance company

pays the claim submitted by the Company or the Purchaser with respect thereto. The Purchaser agrees to give notice to the Representatives of any claim for indemnification describing the basis therefor in reasonable detail within two (2) years of Closing; provided, however, that the failure to receive such notice shall not relieve the Shareholders from any liability in respect of such claim unless and to the extent that the Shareholders shall be prevented from reducing or eliminating such claim as a direct result of its failure to receive timely notice. Should the Purchaser release any Company from any liability hereunder, such release shall not affect, modify, reduce or lessen the liability of any other Shareholder hereunder.

10.2.2  The Shareholders will reimburse the Purchaser from time to time on demand for (a) any payment made by the Company, any of its Subsidiaries, or the Purchaser at any time in respect of any liability, obligation or claim, and (b) any expense which the Purchaser may sustain or incur, to which the foregoing indemnity relates.

10.2.3  The Purchaser shall have the right to set off any sum owed to the Purchaser, or the Companies by the Shareholders or any of them pursuant to the foregoing indemnity, against any sum owed to any Shareholder by the Purchaser. Exercise of such right of setoff shall not be a waiver of any other rights or remedies which the Purchaser may have against the Shareholders or any of them. Such right of setoff shall not limit the liability of Shareholders hereunder, and such right shall be in addition to, and not in lieu of, any other rights and remedies that the Purchaser may have against the Shareholders or any of them pursuant to this Agreement.

10.2.4  If any Shareholder should dispute the right of the Purchaser to indemnification hereunder, such Shareholder shall give the Purchaser written notice of such dispute, specifying in detail the basis of the dispute, not later than twenty (20) days after receipt of demand for indemnification, or notice of the exercise by the Purchaser of the foregoing right of setoff. If the dispute cannot be resolved amicably, either party may institute suit against the other party provided by the Federal Rules of Civil Procedure in effect at such time regarding selection of forum and venue. All parties hereto agree to submit to the jurisdiction of such court for the purpose of such suit or suits.

10.2.5  The Purchaser shall be entitled to such indemnification from time to time and shall be entitled to rely upon one or more provisions of this Agreement without waiving its right to rely upon any other provisions at the same time or at any other time, nor shall the assertion of any such demand bar the Purchaser from resorting, at any time or times, to any other remedy available to it under this Agreement or otherwise.

10.2.6  In the event that a claim is made against the Company or litigation is commenced by a third-party against the Company the result of which could give rise to a claim by the Purchaser against the Shareholders pursuant to this Section 10, the Shareholders shall be given the right (at their expense) to participate in and (if the Shareholders' interests do not conflict with the Purchaser's interests) direct the defense thereof, provided that the Shareholders are prepared to act in a timely fashion. The Shareholders shall notify the Purchaser promptly after they receive knowledge of any such

claim or litigation. The Purchaser shall notify the Representatives promptly after it receives knowledge of any such claim or litigation. If the Shareholders do not assume the direct defense thereof in a timely fashion, then the Purchaser and/or the Company shall be entitled to defend such action, and the Shareholders shall be responsible for all reasonable costs and expenses incurred thereby.

10.2.7   The Purchaser agrees to indemnify and hold Shareholders harmless against any claims, losses, expenses, obligations, deficiencies, liabilities and lawsuits (including reasonable attorneys' fees) which arise from or are related to (a) any material breach or failure of Purchaser to perform any covenant or agreements set forth herein, (b) the material inaccuracy of any representation or warranty made by Purchaser, (c) any material obligation or liability of Purchaser not specifically disclosed to Shareholders pursuant to this Agreement, provided such claim is communicated to Purchaser within two (2) years after Closing, and (d) related to Purchaser's operation of the Companies after Closing.

11.0 NOTICES. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given, if placed in the mail, registered or certified (return receipt requested), postage paid or personally delivered, addressed as follows:

| | |
|---|---|
| The Purchaser: | Southern Airways Corporation<br>2875 South Ocean Boulevard<br>Suite 265<br>Palm Beach, Florida 33480<br>Attn:  R. Stan Little, Jr |
| With Copies to: | Morrison Tenenbaum PLLC<br>87 Walker Street, Second Floor<br>New York, NY 10013<br>Attn: Jerald M. Tenenbaum |
| The Shareholders: | The Darlene Storz Living Trust,<br>The I. Shane Storz Trust, and S. Darnea<br>Wood, in care of Shane Storz,<br>2193 Horine Road<br>Festus, Missouri 63028 |
| With Copies to: | Steven H. Akre, PC<br>13321 N. Outer Forty Suite 100<br>St. Louis, Missouri 63017<br>Attn:  Steven H. Akre, Esq. |

Each of the foregoing(including the Shareholders) shall be entitled to specify a different address by giving notice in writing thereof to the other of them.

12.   MISCELLANEOUS.

### 12.1  DISPUTE RESOLUTION.

12.1.1 NEGOTIATION. The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to settle the controversy. Purchaser or the Shareholders may give the other written notice of any dispute not resolved in the normal course of business. Within thirty (30) days after delivery of such notice, the receiving party shall submit to the other a written response. The notice and the response shall include (1) a statement of each party's position, (2) a summary of arguments supporting that position, and (3) the name, title, and contact information of the executive who will represent that party. Within thirty (30) days after delivery of the disputing party's notice, the executives of both parties shall meet at a mutually agreeable time and place in St. Louis, MO, and thereafter in St. Louis, MO as often as they reasonably deem necessary to attempt to resolve the dispute. All reasonable requests for information made by one party to the other shall be honored. All negotiations pursuant to this Section 12.1.1 are confidential and shall be treated as compromise and settlement negotiations for purposes of the applicable rules of evidence. If the dispute cannot be settled through negotiation within thirty (30) days following the initial meeting of the executives provided for above, either party may commence an action as provided for in 12.1.2, below, unless otherwise agreed upon between the parties.

12.1.2 ARBITRATION.    Any disputes, claims, or controversies between the Parties, including, but not limited to, those arising out of or related to this Agreement not resolved pursuant to Section 12.1.1, shall be resolved through arbitration.   This agreement to arbitrate shall survive the termination, expiration, or rescission of this Agreement. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association and shall be undertaken pursuant to the Federal Arbitration Act. The arbitration shall be held in Atlanta, Georgia, unless the Parties agree on another location. The decision of the arbitrator shall be enforceable in any court of competent jurisdiction. Each Party shall bear his or its own costs and attorneys' fees in connection with the arbitration. The arbitrator shall not award punitive or consequential damages, and the Parties hereby waive any rights to such damages. The relationship created by this Agreement could give rise to the need by one or more of the Parties for emergency judicial relief. Any Party shall be entitled to pursue remedies for emergency or preliminary injunctive relief in any court of competent jurisdiction, but immediately following the issuance or denial of any such emergency relief the Party pursuing such relief will consent to the stay of such judicial proceedings on the merits pending arbitration of all underlying claims between the Parties.

12.1.3 JURSDICTION; VENUE. The parties hereto agree that any Proceeding seeking to enforce any arbitration award pursuant to Section 12.1.2 based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in such United States District Court as provided in the Federal Rules of Civil Procedure for selection of forum and venue, so long as one of such courts shall have subject matter jurisdiction over such proceeding. Process in any such proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that

service of process on such party as provided in this Section 12.1.3 shall be deemed effective service of process on such party.

12.1.4 SPECIFIC PERFORMANCE. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any federal court with proper jurisdiction and venue, as provided in Section 12.1.3.

12.2 GOVERNING LAW. This Agreement shall be governed by the laws of the State of New York, excluding its choice of law principles.

12.3 REQUIRED ARBITRATION NOTICE. **THIS AGREE-MENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

12.4 ENTIRE AGREEMENT. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties and there are no warranties, representations, or other agreements between the parties in connection with the subject matter hereof except as specifically set forth herein. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

12.5 HEADINGS. Section and subsection headings are not to be considered part of this Agreement, are included solely for convenience and are not intended to be full or accurate descriptions of the contents thereof.

12.6 AMENDMENT OR MODIFICATION. The parties hereto may amend or modify this Agreement in such manner as may be agreed upon by a written instrument executed by or on behalf of such parties.

12.7 COSTS AND EXPENSES. Each party hereto shall bear their own costs and expenses in connection with the negotiation, preparation, execution and performance of this Agreement.

12.8 SCHEDULES. Schedules to this Agreement are an integral part of this Agreement.

12.9 COUNTERPARTS. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.10 GENDER AND NUMBER. Whenever the context of this Agreement shall render it reasonably appropriate, the masculine or neuter gender shall include the masculine, feminine, and neuter gender, and the singular shall include the

plural.

      12.11  PARTIES BOUND. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, their respective heirs, administrators, personal representatives, successors and permitted assigns.

      IN WITNESS WHEREOF, the parties have executed this Agreement as of   the day and year first written above.

PURCHASER:

SOUTHERN AIRWAYS CORPORATION

By: _____
    R. Stan Little, Chairman and CEO


SHAREHOLDERS:

DARLENE STORZ LIVING TRUST, dated July 9, 1997, as amended November 8, 2013

_____
Darlene Storz, Trustee


I. SHANE STORZ TRUST, dated January 13, 2016

_____
Ivan Shane Storz, Trustee

_____
S. Darnea Wood

plural.

        12.11   PARTIES BOUND. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, their respective heirs, administrators, personal representatives, successors and permitted assigns.

        IN WITNESS WHEREOF, the parties have executed this Agreement as of   the day and year first written above.

PURCHASER:

SOUTHERN AIRWAYS CORPORATION

By: _____
    R. Stan Little, Chairman and CEO

SHAREHOLDERS:

DARLENE STORZ LIVING TRUST, dated July 9, 1997, as amended November 8, 2013

_____
Darlene Storz, Trustee

I. SHANE STORZ TRUST, dated January 13, 2016

_____
Ivan Shane Storz, Trustee

_____
S. Darnea Wood