## MUTUAL RESOLUTION AND RELEASE

THIS MUTUAL RESOLUTION AND RELEASE AGREEMENT (this "Agreement") is entered by and among Multi-Aero, Inc. ("MAI"), Southern Airways Corporation ("SAC"), JTA Leasing and Sales, LLC ("JTA"), and I. Shane Storz, Darlene Storz, and Darnea Wood (collectively "Shareholders"), this 8th day of June, 2022 (hereinafter "Parties").

WHEREAS, SAC and Shareholders were parties to a certain Stock Purchase Agreement ("SPA") dated March 31, 2022; and

WHEREAS, issues have developed between some parties; and

WHEREAS, the Parties deem it to be in their respective best interests to resolve all known and unknown issues and the Parties have joined this Agreement for the purpose of agreeing to the terms hereof.

NOW, THEREFORE, for an in consideration of the mutual covenants and agreements set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties have agreed to resolve and release, except as expressly provided herein, all rights, claims, demands, disputes, and alleged claims arising out of issues among the Parties upon the terms set forth hereinbelow.

1. <u>Breach of Employment Agreement:</u>  SAC hereby rescinds, renounces, and withdraws any allegation of breach of that certain Employment Agreement dated March 31, 2022, by and between I. Shane Storz and SAC, effective as of the date hereof.  This Agreement shall render any alleged breach of I. Shane Storz's Employment Agreement as cured and moot.

2. <u>Employment Reinstatement, Resignation, and Buy-Out:</u>  SAC hereby reinstates I. Shane Storz as President of MAI and ends his temporary paid leave status.   Simultaneously with the execution of this Agreement, SAC and I. Shane Storz shall execute a separation agreement substantially in the form attached hereto as Exhibit [A] (the "Separation Agreement") which will permanently terminate, without cause, the I. Shane Storz Employment Agreement. Upon the mutual execution of the Separation Agreement I. Shane Storz shall tender his resignation, without cause, of all positions with MAI and SAC.  I. Shane Storz agrees to provide SAC and/or MAI, upon reasonable request, such telephone and email support relating to MAI for a period of six (6) months from the date hereof.  It is understood by I. Shane Storz and MAI and/or SAC if such mutual assistance and cooperation services are requested of I. Shane Storz that involve more than

1



PETITIONER'S EXHIBIT 2

one hour any given week or travel, I. Shane Storz shall be paid reasonable compensation and reimbursed for any travel or other related expenses.

3. <u>Removal of Personal Office Items:</u> MAI and/or SAC shall allow I. Shane Storz access on June 9, 9:00 a.m., or such mutually agreeable time to remove his office furnishings and personal items from his office at 12300 Old Tesson Road, Suite 200F, St. Louis, Missouri, provided however that a representative of SAC shall be present to review and approve the removal of such personal items. In the event of a dispute with respect to this Section 4, the parties will promptly contact counsel for I. Shane Storz and counsel for SAC, and counsel shall act in good faith to promptly resolve such dispute.

4. <u>SIDA Badge:</u> SAC acknowledges the return of I. Shane Storz's badge (ID/Access Control Badge) to Lambert St. Louis International Airport Bureau of Security Operations.

5. <u>Independent Contractor Termination and Buy-Out:</u> SAC and S. Darnea Wood hereby mutually agree to terminate, without cause, that certain Independent Contractor Agreement dated March 31, 2022 (the "Independent Contractor Agreement". SAC and S. Darnea Wood shall execute a termination agreement, substantially in the form attached hereto as Exhibit [B] (the "IC Termination Agreement"). S. Darnea Wood agrees to provide such consulting assistance as may be reasonably requested in the future ~~at an hourly rate mutually agreed to at the time of such request.~~ *not to exceed six months from March 31, 2022.*

6. <u>Release of Non-Competes:</u> I. Shane Storz and Darnea Wood shall be released from their respective non-competition provisions of their respective Employment Agreement and Independent Contractor Agreement, *but they may not have an ownership interest in another air carrier.*

7. <u>Intellectual Property/Technical Cooperation:</u> The Shareholders agree to provide intellectual property/technical cooperation in perpetuity, but not to exceed three (3) years, for any needed access or passwords for any MAI account, service, login, program or security system.

8. <u>Non-Disparagement:</u> SAC and Shareholders hereby agree and ratify the SPA agreement non-disparaging provisions and further agree ~~to shake hands, smile, and wish the other well and~~ never to discuss the matters with anyone else *outside their respective companies or families.* Provided, however, unless required by a judicial tribunal or administrative agency or body with authority to compel such disclosure.

9. <u>Personal Property Tax:</u>

    (a) As referenced in SPA Schedule 2.17, the Shareholders agree to pay the 2022 personal property tax as determined by the Missouri Tax Commission and assessed by St.

2

Louis County, Missouri apportioned for the period January 1, 2022 to March 31, 2022. This amount has not been determined as of the date hereof, and is due by December 31, 2022. MAI/SAC shall notify and copy Shareholders upon receipt of the property tax bill.

(b) As referenced in SPA Schedule 2.17, the Shareholders shall complete filing Arkansas Ad Valorem Tax Report(s), and the Shareholders agree to pay personal property tax as apportioned and determined by the Arkansas Public Service Commission and assessed by the local taxing jurisdiction for tax periods prior to December 31, 2021, and as apportioned for the period January 1, 2022 to March 31, 2022. SAC/MAI hereby agree to support ~~any action~~ *reasonable actions* by Shareholders, at Shareholders' cost, undertaken to abate any penalty assessment by the Arkansas Public Service Commission.

10. <u>Form 1094/1095-C Potential Penalty:</u> The Shareholders shall be responsible for any assessment of penalty assessed by the Internal Revenue Service ("IRS") against MAI for ~~filing~~ *failing to file* IRS Form 1094C for employee health insurance coverage for all periods prior to March 31, 2022. This potential penalty was unknown as of March 31, 2022. SAC/MAI hereby agree to support any *reasonable* action by Shareholders, at Shareholders' cost, undertaken to abate any such assessment and SAC/MAI agrees to: *do the following, to such extent as SAC/MAI is able:*

(a) provide Shareholders (formerly MAI's accountants for calendar years 2018-2020, a list of all employees, including:

(i) Social Security numbers, addresses, hire and last date of employment, and hours worked each month;

(ii) whether all employees were offered health insurance after three (3) months, whether they were part-time or full-time;

(iii) whether insurance ended on the date of termination or whether coverage was provided to the last day of the month employed;

(iv) whether COBRA coverage was offered to terminated employees, and if so, for how long after termination;

(v) whether insurance coverage was offered to employees or available for spouse and dependents also, and

(vi) the lowest employee required contribution rate for each month for the health plan offered, and/or

3

    (b) permit Shareholders access to relevant employment and health insurance records that may be requested by Shareholders or their authorized representative(s) to establish reasonable cause to abate such assessment(s).

Further, any refund of a penalty to the IRS associated with a successful abatement of any potential assessment shall be paid over to Shareholders. SAC/MAI agrees to sign IRS Form 2848, Power of Attorney, for Shareholders' representative. Shareholders shall hold harmless and indemnify SAC/MAI from any such penalty assessment, and all SAC/MAI costs and expenses related thereto, including without limitation the out-of-pocket fees of its attorneys.

  11. <u>Claims Act:</u> The Shareholders shall be responsible for any actions or determinations relating to that certain False Claims Act No. 22-01 disclosed in SPA Schedule 2.17 (the "Claims Act Investigation"). SAC agrees to permit Shareholders or their authorized representative(s) access to MAI records requested in connection with such Claims Act. Shareholders shall bear costs of defense and indemnify and hold harmless MAI and SAC from any and all actions, determinations, fees and penalties arising from the Claims Act Investigation, and all SAC/MAI costs and expenses related thereto, including without limitation the out-of-pocket fees of its attorneys.

  12. <u>SPA Schedule 8.4:</u> SAC shall execute the Indemnification Agreement in a form reasonably acceptable to SAC pursuant to Section 8.4 of the SPA and deliver to Shareholders.

  13. <u>Indemnification and Hold Harmless</u>: The Parties agree, except as expressly provided herein, notwithstanding any provision herein or in said SPA to the contrary, to mutually indemnify and hold the other parties hereto harmless and indemnify against any judgments, assessments, decrees, costs, expenses (including reasonable attorney fees) or any other loss which the Parties may sustain, become liable for, or be asserted by a party hereto on any and all claims, demands, assessments, actions, causes of action or suits of any kind or nature whatsoever, in connection with, relating to, or arising from this Agreement, the SPA, the Employment Agreement, and the Independent Contractor Agreement.

  14. <u>Release of Escrow Funds:</u> Subject to mutual execution of this Agreement, and subsequent execution of the Separation Agreement and the IC Termination Agreement both of which will be effective on the date hereof, and following the applicable revocation periods set forth therein, SAC hereby authorizes the release of $200,000 held in escrow pursuant to the SPA and that certain Escrow Agreement dated March 31, 2022. SAC and Shareholders agree that the

4

remaining $400,000 held pursuant to said Escrow Agreement shall continue to be held pending **(a)** resolution of the Form 1094/1995-C filing matter in Paragraph 11 hereinabove, **(b)** reconciliation of Shareholders' inventory representation(s) set forth in the SPA Schedule 2.27.3 and **(c)** resolution of any other breaches of the SPA representations and warranties. SAC hereby grants its authorization to release the balance of the escrow funds ($400,000) upon **(x)** the first to occur (i) of the IRS1094/1095-C matter, or (ii) proof of payment in full of any 1094/1095C penalty(ies) assessment (or proof that no such amounts are due), and (iii) resolution of all other breaches of the SPA representations and warranties before August 15, 2022, and **(y)** reconciliation of the inventory matter, which must be completed by no later than August 15, 2022, subject to Section 20, below. ~~Notwithstanding the foregoing, in the event the IRS assessment, is less than said remaining escrow balance, such amount exceeding the assessment shall be released to Shareholders, and further~~ Notwithstanding the foregoing, if no determination is made ~~by~~ concerning the IAS assessment August 15, 2022, the Escrow Agent shall continue to hold $270,000.00 (less reductions related to penalties for calendar year 2021 that have been waived by the IRS) in sale proceeds until such time as the matter described in **(a)** above is fully and completely resolved with the IRS. It is the intention of the parties that all credits and debits relating to alleged breaches of representations and warranties in the SPA, and all post SPA payment obligations between the parties hereto (other than those set forth in Section 15 below) will be fully and finally resolved in accordance to this Section 14.

15. <u>Credits and Refunds Due Shareholders:</u> As of March 31, 2022, the following credits or refunds were due or accrued to MAI, and in turn, ~~owed to~~ Claimed by the Shareholders:

| | |
|---|---|
| $25,338.00 | Lambert St. Louis International Airport City of St. Louis rates and charges credit for 2020 and 2021 – set forth in SPC Paragraph 4.6, which credit may be reduced by amounts due thereto for periods preceding March 31, 2022. |
| 37,157.46 | W. Brown & Associates prepaid insurance (Products and Completed Operations) |
| 33,537.78 | W. Brown & Associates prepaid insurance (Aircraft) |
| 53.08 | Prepaid insurance (Pollution) |
| 3,717.57 | Chubb ACE American Insurance Co. prepaid insurance (vehicles) |
| 86.06 | Granite State – Prepaid insurance – (General Liability-Offices) |

       3,100.84    Prepaid Software (Flight Docs)

       <u>2,722.75</u>    Prepaid Software (Sked Flex)

$105,713.00    TOTAL

SAC agrees to notify Shareholders promptly upon receipt of such refunds and pay to Shareholders the refunded amounts as and when received, endorse for payment to Shareholders, ~~or pay in full such amount upon the execution hereof.~~ [initials]

    16.    <u>Transition Account:</u> Pursuant to said SPA, the Shareholders maintained an MAI "Transition" account at the Bank of Kirksville as a clearinghouse for MAI accounts receivable and accounts payable earned or accrued prior to April 1, 2022. [Exhibit C] is a complete and accurate accounting of the Transition account as of March 31, 2022 to the date hereof. Pursuant to the SPA, Schedule 4.6, Shareholders are to receive twenty percent (20%) of prepaid ticket sales as of March 31, 2022 or $28,997.39, and SAC is to receive eighty percent (80%) of such prepaid ticket sales or $144,986.97. Any amounts described in Section 15, above, that have been received by SAC as of the date hereof shall be deposited in the Transition account for the benefit of Shareholders, and any future amounts shall be deposited in such account as they are received by SAC. Upon execution of this Agreement, the Shareholders shall cause to be paid by wire transfer from the Transition account on behalf of SAC: (a) $100,000 to the FAA Escrow Agent pursuant to section 22, below, and (b) $19,648.97 to the account specified by SAC ((a) and (b) together being the amount due to SAC for prepaid tickets as described in the SPA, less the Lambert St. Louis International Airport credit described in Section 15, above). The Shareholders and/or JTA shall retain ownership over the Bank of Kirksville Transition account.

    17.    <u>Employment Retention Credit:</u> The Shareholders/MAI applied for the Employee Retention funding under the CARES ACT, identified in Schedule 4.6 of the SPA, for periods prior to March 31, 2022. The Shareholders and MAI/SAC agree any funds received pursuant to such applications shall be paid over by MAI/SAC to the Shareholders. MAI and SAC agree to cooperate and assist Shareholders with the processing of such application, including but not limited to, authorizing signatures by S. Darnea Wood or an authorized representative, to co-sign a revised engagement letter retaining Shareholders' designated accountant and Form 941-X ([Exhibit D]), provided SAC shall not be responsible for any fees or expenses of such accountant, *and shareholders shall indemnify SAC/MAI against any future claims against these funds whether by error, fraud, or otherwise.*

6

18. <u>Insurance Claim:</u> As referenced in SPA Schedule 4.6, upon receipt of payment of Insurance Claim on N208EE, Policy No. NAC5014775, reported July 5, 2018, SAC/MAI shall inform Shareholders of any request for information, receipt of payment, and pay over to Shareholders the amount recovered, anticipated to be approximately $28,000.00 representing a $28,000.00 deductible and lost revenue.

19. <u>Legal Fees:</u> ~~SAC shall pay one-half the reasonable legal fees of Shareholders associated with negotiating, drafting, and executing this Agreement, such payment not to exceed five thousand dollars ($7,500.00).~~

20. <u>Inventory:</u> The Parties agree to reconcile no later than August 15, 2022, any inventory disparity between SPA Schedules 2.8 and/or 2.27.3 (as may be amended by the parties) and a statistical sampling analysis. ~~If not resolved on or before such date, any claim or offset arising from any disparity shall be waived by SAC.~~ In the event of a dispute with respect to this Section 4, the parties will promptly contact counsel for I. Shane Storz and counsel for SAC, and counsel shall act in good faith to promptly resolve such dispute, provided however that the remaining escrow amount may not be released until a resolution of all inventory disputes satisfactory to both parties has been reached.

21. <u>Caravan Seats:</u> JTA ordered through MAI, prior to the SPA Closing, aircraft seats for N1258B. SAC/MAI and JTA agree to equally split the cost of said seats. JTA has prepaid one-half of the cost for said seats. Upon receipt of the seats and invoice for the balance due, SAC/MAI shall be responsible for and agrees to pay such invoiced balance amount. A true and correct copy of the Caravan Seat Order, and evidence of payment therefor, is attached hereto as Exhibit [E].

22. <u>Aircraft Acquisition:</u> JTA agrees to sell and SAC agrees to buy four (4) Cessna 208 Grand Caravan aircraft identified as N4118K, N1258B, N750Z, and N1983X, more specifically described in the Aircraft Purchase Agreement attached hereto as Exhibit [F] (the "Aircraft") for an aggregate price of $4,550,180.00, to be paid as set forth therein. The Aircraft Purchase Agreement is being entered into simultaneously with this Agreement and shall contain the following terms: **(a)** Upon mutual execution of this Agreement, SAC or its affiliate shall deposit with an FAA Escrow Agent acceptable to both parties a non-refundable deposit of $25,000.00 for each aircraft ($100,000.00 total), and the balance of $4,450,180.00 shall be payable as follows: (i) $4,000,000 on the Closing Date (as defined herein) and (ii) the remainder subject to

7

the expiration of all revocation periods as described in the Separation Agreement and the Termination Agreement attached hereto as Exhibit A and Exhibit B, respectively (provided that such agreements are not revoked during the applicable revocation periods); **(b)** Shareholders / JTA agree to make the Aircraft available to SAC between the date hereof and June 10, 2022 [11:59 pm on] in order to enable SAC to conduct (i) a visual [and tactile] inspection of the exterior and interior of the Aircraft; (ii) logbook and related records review of the aircraft, and (iii) tactile inspection of the Aircraft; **(c)** if the parties determine that there are any airworthiness repairs, annual inspections and/or maintenance program items, as the case may be, required as to the Aircraft, a written discrepancy list shall be prepared; **(d)** JTA / Shareholders agree to repair, at their cost and expense, any airworthiness and Maintenance Program (as such term is defined in 14 C.F.R. Part 43, Appendix A, Paragraph (b)) discrepancy list items, **(e)** should JTA / Shareholders determine not to repair airworthiness and Maintenance Program discrepancy items, SAC shall have the right to either (i) accept the Aircraft on an as is, where is basis, or (ii) terminate ~~the Aircraft Purchase Agreement~~ [this agreement] which in such case shall be deemed void *ab initio* upon written notice by SAC, and escrow agent shall promptly return the deposit; and **(f)** if SAC rejects the Aircraft following the [successful] completion of such repairs, SAC shall forfeit its $100,000.00 deposit. Subject to SAC's termination right set forth in Subsection (e)(ii) of this Section 22, **(v)** the Aircraft shall be delivered to SAC at KSTL or such mutually agreed location; **(w)** Title to the Aircraft and risk of loss shall pass from JTA to SAC at the time Christi Law, Elite Aircraft Title & Escrow, LLC or such mutually agreed Escrow Agent ("FAA Escrow Agent") files the FAA Bills of Sale at the FAA Registry; **(x)** SAC shall pay the escrow fee and prepare and file with said Escrow Agent, FAA Applications for Registration; **(y)** JTA shall prepare and file with said Escrow Agent FAA Bills of Sale; and **(z)** the closing date shall be June 22, 2022, but no later than June 30, 2022 (the "Closing Date"). ~~In the event the Aircraft Purchase does not close for any reason other than as set forth above, the Aircraft Purchase Agreement shall provide for the payment of the non-refundable deposit to JTA.~~

23. <u>Entire Agreement and Authority</u>: This Agreement embodies the entire agreement and understanding among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings relating to this "global" resolution. The Parties certify they are relying on no representations, warranties, covenants, or agreement except for those set forth in this Agreement. The Parties warrant to each other such party has the full power and authority to execute and deliver this Agreement.

24. <u>Governing Law:</u> This Agreement shall be construed in accordance with the law of the State of New York and performed within the jurisdiction and venue of St. Louis County, State of Missouri.

25. <u>Binding:</u> This Agreement, when executed, shall be binding upon the undersigned, their heirs, successors, assigns, employees, officers, representatives, and agents, and shall have the effect of resolving and releasing any claims or rights held by the Parties, whether contingent or otherwise.

26. <u>Counterparts:</u> This Agreement may be executed in one or more counterparts, and all counterparts so executed shall together constitute one agreement, binding on all Parties.

27. <u>Effective Date:</u> This Agreement is effective upon its execution by the Parties, as of the date first above written.

* * * Signature Pages Follow * * *

# MUTUAL RESOLUTION AND RELEASE
### Signature Page

IT IS SO AGREED.

Multi-Aero, Inc.

By: _Stan Little_ , its President

Southern Airways Corporation

By: R. Stanley Little, Chairman and CEO

JTA Leasing and Sales, LLC

By: S. Darnea Wood, Manager

S. Darnea Wood, Shareholder and Individually

I Shane Storz Trust Dated July 9, 1997, as amended November 8, 2018   01/13/2016

By: I. Shane Storz, Trustee, Shareholder

I. Shane Storz, Individually

Darlene Storz Living Trust Dated July 9, 1997, as amended November 8, 2018

By: Darlene Storz, Trustee, Shareholder

Darlene Storz, Individually

MUTUAL RESOLUTION AND RELEASE
Signature Page

IT IS SO AGREED.

Multi-Aero, Inc.

By:_____, its President

Southern Airways Corporation

By: R. Stanley Little, Chairman and CEO

JTA Leasing and Sales, LLC

By: S. Darnea Wood, Manager

S. Darnea Wood, Shareholder and Individually

I Shane Storz Trust Dated July 9, 1997, as amended November 8, 2018   01/13/2016

By: I. Shane Storz, Trustee, Shareholder

Darlene Storz Living Trust Dated July 9, 1997, as amended November 8, 2018

By: Darlene Storz, Trustee, Shareholder

I. Shane Storz, Individually

Darlene Storz, Individually

10

## MUTUAL RESOLUTION AND RELEASE
### Signature Page

IT IS SO AGREED.

Multi-Aero, Inc.

By: *Stan Little* , its President

Southern Airways Corporation

By: R. Stanley Little, Chairman and CEO

JTA Leasing and Sales, LLC

By: S. Darnea Wood, Manager

S. Darnea Wood, Shareholder and Individually

I Shane Storz Trust Dated July 9, 1997, as amended November 8, 2018

By: I. Shane Storz, Trustee, Shareholder

I. Shane Storz, Individually

Darlene Storz Living Trust Dated July 9, 1997, as amended November 8, 2018

By: Darlene Storz, Trustee, Shareholder

Darlene Storz, Individually

10